HEARD NOVEMBER TERM, 1877.

## SNIDER *vs.* ROBERTSON.

Testator having a brother H. who was an alien, and the chief object of his bounty, devised certain real estate to R. G. in trust and "for the use and benefit of my brother H. if alive at my death, the legal title to remain and be vested in the said R. G. until such time as the said H., now an alien, shall become duly qualified, according to Acts of Congress of the United States of America, to take and to hold said real estate. When the said H. becomes so qualified, the said R. G. is hereby directed to execute to the said H. a valid conveyance in fee to said" real estate, "the rents and profits to go to the said H. from the time of my decease."
H. never became naturalized under Acts of Congress, but after the death of testator he became a denizen under the laws of this State: *Held,* That, according to the legal construction of the will, H. upon his becoming a denizen, became qualified to take the real estate, and, therefore, there was no lapse or failure of the devise.

## BEFORE MACKEY, J., AT YORK, JUNE, 1876.

This was an action by William H. Snider and M. Alice Latimer against Charlotte J. Robertson, Ader E. Hacket (now Faulconer) and E. Almeen Hacket to recover possession of certain real estate.

The case arose out of the provisions of the will of William Hacket, Sr., which is as follows:

"In the name of God, amen! I, William Hacket, of the District and State aforesaid, desirous of disposing of my worldly estate, and being of sound and disposing mind and memory, do make this my last will and testament, in manner and form following, viz.:

"*First.* I will, desire and so direct my executors, hereinafter named, to promptly pay all just debts that I may owe at my decease.

"*Second.* I will, bequeath and devise to Robert G. McCaw, of said District and State, my plantation on Turkey Creek, known as the Latimer tract of land, containing about two hundred and forty acres; my house and lot in Yorkville, known as lot No. 19, whereon I now reside; and my tract of land near the village of Yorkville, known as the Chambers tract, containing about eighty acres, (reserving one acre of the Chambers tract adjoining the graveyard of the Independent Presbyterian Church,) in trust and upon condition for the said Robert G. McCaw to have and to hold the said tract of land and house and lot for the use and benefit of my brother, Hugh Hacket, if alive at my death, now residing in the North of Ireland, at Drumahagles, near Balleymaney, County of Antrim, the legal title to remain and be vested in the said Robert G. McCaw until

such time as the said Hugh Hacket, now an alien, shall become duly qualified, according to Acts of Congress of the United States of America, to take and to hold said real estate. When the said Hugh Hacket becomes so qualified, the said Robert G. McCaw is hereby directed to execute to the said Hugh Hacket a valid conveyance in fee to said tracts of land and house and lot; the rents and profits of said Turkey Creek tract and house and lot in Yorkville to go to the said Hugh Hacket from the time of my decease.

" *Third.* I will, bequeath and devise to my said brother, Hugh Hacket, if alive at my death, my negroes, viz.: Isaac, Cely and son Ben, Till and her daughter Laura, Hiram, Delhi and her children Osceola, Charles, Wyona, Nero and Hariet, Margaret, and the increase of said female slaves that may hereafter be born previously to my death.

" *Fourth.* I will, bequeath and devise unto my said brother, Hugh Hacket, if alive at my death, my negroes Alcey, Mary and her daughter Louisa and Dick, in special charge and confidence that as soon as may be practicable after my decease he do erect a comfortable house for them to live in upon the Chambers tract of land devised in the second clause of this my will; and that the said Hugh permit Alcey, Mary and her daughter and Dick there to reside in the enjoyment of all the rents and profits of said last mentioned tract, without any person exacting or requiring any service or labor from either the said Alcey, Mary or Louisa, and that they be supported and maintained on the said tract of land, during their several lives, out of the interest of the sum of one thousand dollars hereby set apart to the said Hugh Hacket for that purpose, and the labor and hire of boy Dick to be applied to their common support.

" *Fifth.* Should my brother, Hugh Hacket, not be alive at my decease, in that event I will and do devise to the said Robert G. McCaw all the real estate named in the second clause of this my will, in trust for the use and benefit of my nephew, William Hacket, eldest son of the said Hugh Hacket, (if the said William be alive at my death,) to be held and conveyed upon like trusts and conditions declared in said second clause of my will. I also give and devise to my said nephew, William Hacket, in the event of my brother, Hugh Hacket's not being alive at my death, all the personal property named in the third and fourth clauses of this my

will, subject to the same special charges and confidence declared in the fourth clause of my will.

"*Sixth.* Should neither my brother, Hugh Hacket, or my nephew, William Hacket, be living at my death, I will and devise the real estate named in the second clause of this my will to the said Robert G. McCaw, in trust, to have, hold and convey the same to my nephew, James Hacket, son of the said Hugh Hacket, when the said James becomes legally qualified to take and hold said real estate. I further give and bequeath to the said Robert G. McCaw my lot of land in Yorkville, known as lot No. 32, in trust, to hold for the use and convey upon said qualification to the said James Hacket. [I declare the devise of lot No. 32 for the use and benefit of James to be in no wise dependent upon the contingency of the deaths of brother Hugh and William at the time of my decease.] Should neither Hugh or my nephew, William, be alive at my death, I will that all the personal property named in the third and fourth clauses of this my will shall go to my nephew James, subject to the same special charges and confidence declared in the fourth clause of this my will.

"*Seventh.* All my other lands, not hereinbefore disposed of, I will, and hereby empower my executors, to sell on a credit of one and two years with note and approved security, and that all my judgments, notes and book accounts be collected by my executors as soon as practicable..

"*Eighth.* I will and devise unto my brother, Hugh Hacket, if alive at my death, all the household and kitchen furniture in my house in Yorkville, also all my mules, cows, hogs, horses or other stock and farming utensils on my Turkey Creek plantation. If the said Hugh be dead at my decease, then I devise the property named in this clause to my nephew, William Hacket, if alive; otherwise, to my nephew, James Hacket.

"*Ninth.* I give and devise to my nephew, James Hacket, my negroes, Adam and Patience with her increase.

"*Tenth.* I give and devise to my sister, Jeney Mallet, two thousand dollars.

"*Eleventh.* I give and devise to my niece, Elizabeth, now Mrs. Ratchford, five hundred dollars.

"*Twelfth.* I give and devise to my niece, Margaret Mallet, one thousand dollars.

"*Thirteenth.* I give and devise to the daughters of my brother, Hugh Hacket, out of my estate not otherwise disposed of, five hundred dollars each.

"*Fourteenth.* I will and declare, if I am possessed of anything not included in the above and not hereinbefore disposed of, that my executors divide the same, together with any legacies that may fall back, equally between my brother Hugh and my sister Jeney Mallet, share and share alike.

"*Fifteenth.* Should any of the legatees under this my will complain or express any dissatisfaction with any dispositions of my estate herein made, I hereby direct and empower my executors, in their discretion, to revoke any and all legacies such complaining legatee or legatees might have been entitled to, and to dispose of the same between my other legatees as to my executors may seem just and proper.

"*Sixteenth.* Whereas in the seventh clause of this my will I have directed my executors to sell all my lands not otherwise disposed of, I hereby declare I mean such of the persons named by me as executors as may qualify before the Ordinary.

"*Lastly.* I nominate and appoint Robert G. McCaw, J. Bolton Smith and James R. Bratton executors of this my last will and testament, hereby revoking all former wills by me made. In testimony whereof I have hereunto set my hand and seal, this sixteenth day of October, 1847."

The issues of the case were tried by the Judge, without a jury, and the case is fully stated in his judgment, which is as follows:

MACKEY, J. This is an action brought to recover certain real estate in the possession of defendants, of which William Hacket, Sr., died seized and possessed, and to which plaintiffs claim they are entitled as the next of kin of said deceased capable of taking under our Statute of Distributions.

The facts of the case as admitted in writing by the counsel for the parties are as follows:

I. William Hacket, Sr., a naturalized citizen, died in York County, S. C., October 18th, 1850, testate, and his will was duly admitted to probate, and a copy thereof and the endorsements thereon were admitted in evidence.

II. That he died seized of the lands described in the complaint.

III. That the relatives of the said William Hacket, Sr., who were living at the date of his death were his brother, Hugh Hacket, an alien, residing in Ireland; James Hacket, a son of said Hugh, an alien, also residing in Ireland; William K. Hacket, a son of said Hugh, likewise an alien, residing in Yorkville, S. C.; Mrs. Jane Mallet, sister of the said Hugh, also an alien, living in York County; Mrs. Margaret Snider and Mrs. Eliza Ratchford, also aliens, the daughters of his said sister, Jane Mallet, and their respective children, (the plaintiffs in this action,) viz.: William H. Snider (son of Margaret Snider,) and Mrs. M. Alice Latimer, (daughter of Mrs. Eliza Ratchford,) both of said plaintiffs being natives of this State, and their fathers citizens thereof.

The plaintiff William H. Snider was born on December 21, 1849, and the plaintiff Mrs. M. Alice Latimer was born in March, 1848.

IV. Office copy admitted in evidence of deed from Hugh Hacket, dated February 15th, 1851, to his son, William K. Hacket, in which deed the said Hugh Hacket granted, bargained and sold to his son, the said William K. Hacket, the real estate mentioned in the second clause of the will of the testator, Wm. Hacket, Sr., "and all the estate, right, title, interest, property, claim and demand, either at law or in equity, of him, the said Hugh Hacket, in and to the same, or any part thereof."

V. That on the 6th day of November, 1854, Hugh Hacket, still an alien, arrived in the United States from Ireland, and came to Yorkville, S. C., and on the 14th day of November, 1854, he filed in the office of the Clerk of the Court for York County his declaration of intention to become a citizen of the United States.

That on December 13th, 1854, he became a denizen of the State of South Carolina, under the Act of 1799, by taking the oath of allegiance, duly authenticated and filed in the office of the Secretary of State, at Columbia, S. C.

That he returned to Ireland in 1855, and died there March 25th, 1873, without ever having returned to the United States.

VI. That James Hacket never came to this State or to the United States.

VII. That Wm. K. Hacket, father of the infant defendants and husband of the defendant, C. J. Robertson, was a resident of this State at the date of testator's death, and became a naturalized citizen thereof on the 16th day of March, 1855.

That in the year 1851, he, Wm. K. Hacket, took possession of the real estate described in plaintiffs' complaint, and held the same, continuously, until his death in 1862, leaving the defendants, as his heirs-at-law and devisees, in possession, and that said defendants have ever since held possession of the same.

VIII. That the said Mrs. Mallet died an alien in June or July, 1874.

That her daughters, the said Mrs. Snider and Mrs. Ratchford, the respective mothers of the plaintiffs, are still alive, and are aliens.

IX. That Robert G. McCaw never executed any formal deed of conveyance or instrument in writing to Hugh Hacket, or to any one else, and that the said McCaw died in 1870.

X. That William K. Hacket had no children alive when the testator, William Hacket, Sr., died in October, 1850; and that the two children of William K. Hacket, the infant defendants herein, were born, respectively, in the years 1855 and 1860.

XI. That on May 31st, 1854, a notice signed R. W. Ratchford, for Margaret A. Ratchford (now the plaintiff Mrs. Latimer) and William Hacket Snider, per J. J. Snider, parents of the plaintiffs, was served, through the Sheriff of York District, on Colonel Robert G. McCaw, the trustee under the will of William Hacket, Sr., notifying him that trespasses were being committed on and damage done to the Chambers tract of land by persons having no title thereto, and that in behalf of said children they would hold him responsible therefor whenever their titles became vested.

Having thus recited the admitted facts in the premises, I now proceed to determine the issues of law involved in this case.

The testator, William Hacket, Sr., by the second clause of his will, devises certain real estate, including property sued for in this action, to Robert G. McCaw, as trustee, which said devise is in the following terms, to wit: " In trust and upon condition for the said Robert G. McCaw to have and to hold the said tracts of land and house and lot for the use and benefit of my brother, Hugh Hacket, if alive at my death, now residing in the North of Ireland, at Drumahagles, near Balleymaney, County of. Antrim, the legal title to remain and be vested in the said Robert G. McCaw until such time as the said Hugh Hacket, now an alien, shall become duly qualified, according to Acts of Congress of the United States of America, to take and hold the said real estate. When the said Hugh Hacket becomes so qualified the said Robert G. McCaw is hereby directed

to execute to the said Hugh Hacket a valid conveyance in fee to said tracts of lands and house and lot, the rents and profits of said Turkey Creek tract and house and lot in Yorkville to go to the said Hugh Hacket from the time of my decease."

As Hugh Hacket was alive at the date of the testator's death I deem it (to use the language of the Court in *McCaw* vs. *Galbraith*, 7 Rich., 80,) "unnecessary to notice the provisions made by the will of William Hacket in favor of the sons of Hugh upon the contingency of his death in the lifetime of the testator."

The intention of the testator must be gathered from the plain language of the will, and must be the *legal intention*, to be ascertained by settled rules of construction.—See *Parker* vs. *Marchant*, 1 Phil. Ch., 360; 6 Cruise's Dig., 148, 3d edition.

A will of real estate, wherever it be made, must be construed according to the laws of the country where the property upon which it is intended to operate is situated, and the testator is presumed to have executed his will in contemplation of the force and effect of such laws.—*Bovey* vs. *Smith*, 1 Vern., 147.

The testator in this case expressly provides that Hugh Hacket "shall become duly qualified, according to Acts of Congress of the United States of America, to take and hold said real estate," and when he "becomes so qualified" the trustee is directed to execute a valid conveyance in fee to him. The beneficial interest is given absolutely to Hugh Hacket, during his life, and that interest was capable of being expanded into a fee simple upon his becoming " duly qualified to take and hold said real estate." The due qualification, clearly contemplated by the testator, was the becoming a citizen of the United States, by naturalization, pursuant to Acts of Congress. Hugh Hacket himself asserted this interpretation of the will, and acted upon it to the extent of filing his declaration of intention to become a citizen of the United States,—an intention, however, which he never executed. Hugh Hacket having died without having "become duly qualified to take and hold said real estate," it reverted, and, not being disposed of by the will, is in the heirs of the testator, and this reversion, undevised, descended to the next of kin capable of taking. This intestacy of William Hacket, Sr., is caused by the failure of Hugh Hacket to comply with the express requirement of the will, a contingency which the testator does not appear to have contemplated, or, if regarded as possible, he has left to be provided for under the laws of the land.

It would appear that Hugh Hacket, in the first instance, actually declined complying with the condition precedent annexed to the devise in question, for on the 25th of February, 1851, within four months after the decease of the testator, he released by deed all his interest in the estate in favor of his son William Hacket. Hugh Hacket subsequently came to this country on November 6th, 1854, but returned to Ireland in 1855 and there remained without again visiting the United States, and died in Ireland on the 25th day of March, 1873.

No stronger evidence than this could possibly be adduced to show the deliberate purpose to abandon his previously declared "intention" to become a citizen of the United States. His becoming a denizen of this State in December, 1854, was not a compliance with the condition of the devise.

In the United States there is no such condition as denizenship.— 1 Bouvier L. Dic., 404 ; Walker's American Law, 138.

It is solely the creation of State law, and the rights and privileges of denizens as to property are determined entirely by the *lex rei sitœ*, and it only confers the specific rights mentioned in the statutes creating it. The Act of the Legislature of South Carolina of 1799, under which Hugh Hacket filed his oath of denizenship, (Statutes at Large, Vol. V, p. 355,) only gives the right " to purchase and hold real property." The terms of the devise required that he " shall become duly qualified, according to the Acts of Congress of the United States of America, to take and hold said real estate" before the trustee could convey the estate to him.—2 Nott & McCord, 352–355.

The " Naturalization Acts of Congress " required five years' residence immediately preceding the time of admission to citizenship. Three years after the declaration of intention to become a citizen the applicant is required to take the oath of allegiance and abjuration. In the language of the Supreme Court of the United States, " the oath of allegiance and abjuration is the *sine qua non* of admission to citizenship."—2 U. S. Stat., 811 ; Act March 3, 1813.

It is contended, however, that Hugh Hacket actually became qualified to take, in accordance with the *intention* of the testator. But how are we to ascertain the intention of the testator better than by taking his very words that he designed to express that intention, and which are free from any obscurity or ambiguity ? Are we to resort to inference as to the meaning when there is no

doubt as to the plain import of the words of the will? The testator did not say that Hugh Hacket "shall become qualified according to the laws of South Carolina," or "qualified according to law," or simply "qualified," but he prescribes the mode in which he shall become qualified, namely, by his becoming a citizen of the United States, that is, "qualified according to Acts of Congress." It seems to be perfectly clear from the will that this mode and degree of qualification formed a part of testator's mind and purpose.

Did testator simply intend that Hugh Hacket should have the benefit of so much in value of his estate? If so, why did he not devise the land to Colonel McCaw to sell and give the proceeds to Hugh Hacket? This he could have done.—*Craig* vs. *Leslie*, 3 Wheat., 563.

The testator imposed a condition upon this devise, and the Court has no right to aid the proposed devisee in his manifest effort to evade that condition. A perusal of the will shows that the testator, in designating Hugh Hacket as the principal beneficiary of his bounty, entertained the two-fold purpose of having his brother, the said Hugh, become a *resident* of York County, and that he should without delay remove his alienage by becoming a naturalized citizen of the United States, to the end that he might be vested with the real estate in fee. The former purpose is made manifest by his constituting the said Hugh Hacket the trustee of a considerable fund, with a special charge that he should invest the same for the use and benefit of certain slaves, the objects of testator's peculiar solicitude. Hugh Hacket was virtually constituted by the testator, as to *those* slaves, both their trustee and *guardian*.

Words cannot mirror human thought more clearly than this purpose is reflected in the fourth clause of testator's will, for the trust and guardianship which that clause imposes could only be effectually executed by Hugh Hacket's actual residence in York County and through his personal care and supervision. This is made evident by a mere recital of the fourth clause of the will, which is as follows:

"*Fourth.* I will, bequeath and devise unto my said brother, Hugh Hacket, if alive at my death, my negroes, Alcey, Mary and her daughter Louisa and Dick, in *special charge and confidence* that as soon as may be practicable after my decease he do erect a comfortable house for them to live in upon the Chambers tract of land, devised in the second clause of this my will, and that the said Hugh

permit Alcey, Mary and her daughter Louisa and Dick there to reside in the enjoyment of all the rents and profits of said last mentioned tract, without any person exacting or requiring any service or labor from either the said Alcey, Mary or Louisa, and that they be supported and maintained on said tract of land, during their several lives, out of the interest of the sum of one thousand dollars, hereby set apart to the said Hugh Hacket for that purpose, and the labor and hire of the boy Dick to be applied to their common support."

How could Hugh Hacket carry out the beneficent purpose of the testator as to the slaves above named by making a hurried visit to this country, four years after testator's death, becoming a denizen within one month after his arrival, and after a mere temporary stay of a few months in York returning to Ireland and there voluntarily remaining all the days of his life? If testator had not himself prescribed the mode of qualification, there could be no doubt but that Hugh Hacket, becoming thus qualified and then abandoning the State, would have been a fraud upon testator's bounty and clearly the defeat of his intention.

If Hugh Hacket had become naturalized according to Acts of Congress and then abandoned the country, deserting his charge of the slaves mentioned, and thus violating the "special confidence" reposed in him by testator, this would have been a fraud upon testator's bounty; but still Hugh would have been entitled to the land, for the will so says, and while the *intention* of testator as to residence is plain he has not expressed that intention in a legal way, and Courts ought not to construct codicils to wills. If necessary to decide the point, I would hold that the denizenship of Hugh Hacket did not qualify him to take by *devise*. Denizenship only gives the specific rights enumerated.

In England denizens can take by purchase and devise, but not by *inheritance*. Our Act of 1799 gives the right "to purchase and hold." This right was intended to be conferred only on persons residing or intending to reside within the limits of this State. The Act, by its terms, (see Section 1, Act 1799,) grants the rights and privileges of denizenship only to those "*who now are, or hereafter shall become, residents in this State.*" Hugh Hacket was never a resident in South Carolina. All of his acts stamped him as a mere transient person in the State, who had no intention of taking up his permanent abode within its limits. But, even granting his

legal denizenship, the Act of 1799 cannot avail to accomplish the end for which it is invoked by those who claim through him the real estate in question. The word " purchase," as used in the Act, clearly means to *buy* for a consideration, and does not refer to one who takes by devise "as purchaser," as distinguished from one who takes by "limitation." In construing the denizen Act it may well be held that there is a difference between the active power to " purchase " and the passive power of taking " by purchase " or " as purchaser " under a will. The statute was manifestly intended to encourage aliens to " become residents in this State " and to bring their *capital here* and invest it by the " purchase" of " real property." If Hugh Hacket could take as devisee, by his mere taking and subscribing the oath of allegiance to this State, then his immediate resumption of his allegiance to the British Crown and his instant and final abandonment of his pretended residence in this State would operate as a successful fraud, both on the intention of the framers of the Act of 1799 and upon the will of William Hacket, Sr.

Hugh Hacket never having had any legal estate in the real property now in suit, it follows that those who claim under him have no legal right thereto.

The defendants cannot derive title through William K. Hacket, for he was an alien at the date of testator's decease, and his subsequent naturalization, in 1855, several years after testator's death, could not have a retroactive effect. In 1 Sp., 533, (case of *Wightman* vs. *LaBorde*,) the Court says: " The effect of naturalization is to invest the alien with all the rights of native-born citizens, but it has no such retroactive operation as to make an alien capable of taking as heir of one who died before his naturalization. He who takes as heir must take at the instant. There can be no restoration of the right of succession by removing the disability." In the case of *McKellar* vs. *McKellar* (1 Sp., 536,) the plaintiffs were the grand-nephews of the deceased and the defendants were his alien brothers, who had removed to South Carolina and given notice of their intention to become citizens, but had not completed their naturalization when the intestate died. The Court there held that the descent was cast upon the plaintiffs, the only relatives who were citizens *at the death of the intestate.* In the case of *Keenan* vs. *Keenan* (7 Rich., 345,) the defendant was the widow of the intestate and an alien when he died, in 1847.

In November, 1847, after intestate's death, she announced her intention of becoming a citizen, and was naturalized in November, 1853.

The Court held that she could not take ; that naturalization is not retrospective, and that " an alien becoming a citizen in the most regular manner does not acquire a right to inherit or to take and hold land which belonged to his ancestor who died before he became a citizen, so as to divest the right of a remoter heir who was a citizen at the time of the death of the ancestor." The native or naturalized children of aliens, if native or naturalized at the time of descent cast, take, notwithstanding the alienage of parents, for they take by our statutes and not at common law.—*North et al.* vs. *Valk*, Dud. Eq., 215–224.

The plaintiffs herein are the only relatives of William Hacket, Sr., alive at his death who were not then aliens, and they claim as " next of kin " under clauses 7 and 8, Sec. 1, of No. 1489, Vol. V of Statutes at Large, p. 163.

If there were any nearer of kin these plaintiffs would have to claim in right of their mothers, and if their mothers were equally near, then in the stead of their mothers under the second clause of the said Section (p. 162) ; but they cannot so take, because—1st. Their mothers are alive ; 2d. Because the mothers are aliens.

But the claim of the plaintiffs is direct as next of kin to William Hacket, Sr., and not by descent at common law, nor under the second clause of the statute above referred to.

Upon this point Chancellor Kent lays down the law thus : " If a citizen dies and his next heir be an alien who cannot take, the alien cannot interrupt the descent to others, and the inheritance descends to the next of kin who is competent to take, in like manner *as if no such alien had ever existed*."—2 Kent Com., 56.

Of course the alien referred to by the author is supposed to be living.

In *Edwards* vs. *Barksdale*, (2 Hill Ch., 417,) the Court says : " In giving construction to the words 'next of kin,' we must take them to mean such 'next of kin' as on general principles of law are qualified to take. For example, if the next of kin were an alien, he is within the letter of the law, yet no one supposes that he can inherit land, or that if a statute similar to ours were passed in England an attainted person could inherit.    *    *    *    *    We

shall hardly conclude that a man's land may escheat to the State though he may have near kindred to inherit it."

In the case of *McClenaghan* vs. *McClenaghan*, (1 Strob. Eq., 321 and 322,) the Court says: "The right of the heir depends not merely on the Act of Distributions, but upon his ability to inherit. Thus it has been repeatedly ruled that where the next of kin, who would be entitled to inherit if not an alien, is disabled to take by reason of his alienage, yet the land shall not escheat if there be an heir capable of taking by succession." * * * "No rule is better established than when an alien would take by a course of descent, then the estate should go over to him to whom it would have gone *if the alien had been already dead.*"

In *Orr* vs. *Hodgson*, the Supreme Court of the United States says : " Where a person dies leaving issue who are aliens, the latter are not deemed his heirs-at-law, for they have no inheritable blood, and the estate descends to the next of kin who have inheritable blood, in the same manner as if no such alien issue were in existence."—4 Wheat., 461.

In the case of *Jackson* vs. *Lunn* (3 Johns. Cas., 121,) Justice Kent holds that "the law *takes no notice* of an alien heir, who, as he cannot take by descent, *shall not impede* the descent to another."

In 1 Speer, 536, it is held that "the succession is cast on the next of kin who can take, passing by those nearest in blood but who cannot take on account of alienage."

The case is divested of difficulty if we bear in mind that the plaintiffs do not claim to take " by representation " nor " by inheritance," but simply as the "only of kin" existing qualified to take, and therefore necessarily "the next of kin" under the statute.

The kinship of blood serves to connect the distributees with the deceased ; it is the natural connecting link; but our Statute of Distributions, while regarding this link, or *nexus*, in determining propinquity of kinship, only recognizes inheritable blood in allowing *representation*, and citizen or *naturalized blood* in allowing one to take intestate property. Those who are the next of kin take by the direct operation of the statute, just as if they had been individually named therein. The question of descent or of representation, therefore, does not arise in this case.

Nor are the defendants entitled by right of possession from lapse of time, for the plaintiffs' right of action did not accrue until the death of Hugh Hacket, in March, 1873.

In the case of *McCaw* vs. *Galbraith*, (7 Rich., 89,) the Court says : "The persons claiming as heirs *have no right to present possession*, for the devise obstructs the descent."

But, in addition to this, a sufficient time had not elapsed since the plaintiffs attained their majority for the statute to bar when they brought this action.

Nor can the infant defendants claim as heirs of the testator, inasmuch as they were born after the death of testator.—6 Rich., 351; 1 Sp., 523.

It does not appear that any of the grounds of defense set forth in the answer of the defendants are tenable.

William Hacket, Sr., it must be held, died intestate as to this real estate.

The Act of 1791 provides as to "real estate" when one shall die without disposing thereof by will. In *Richardson* vs. *Richardson*, (Dud. Eq., 196,) the Court held that devise of land was void because the plaintiff, Richardson, was a witness to the will, and speak of the land as "real estate descended," treating it as a case of intestacy. All that prevented the plaintiffs from taking instantly upon the death of William Hacket, Sr., was the contingent devise in favor of Hugh Hacket. That devise obstructed the descent and made it contingent. But upon the death of Hugh Hacket, he dying an alien and not having acquired the title, the estate vested in the plaintiffs, *eo instanti*, they having been entitled to take then just as they would have taken at the death of William Hacket had he made no contingent devise, their right relating back to the date of his decease, for only those alive and qualified *at that date could* take.

It is therefore adjudged and decreed that the plaintiffs, William H. Snider and M. Alice Latimer, are entitled to the real estate in question, consisting of the house and lot and the fifty-four acres of land situated within the corporate limits of the town of Yorkville, and the two hundred and forty acres of land on Turkey Creek, in the County of York, described in the complaint herein, and that they do have judgment for the immediate possession thereof. It is further ordered and decreed that unless all of the said real estate be surrendered at once to the plaintiffs, that the Sheriff of York County do forthwith proceed to put the said plaintiffs in possession of the same.

The costs in this action must be paid by the defendants.

No claim for rent having been made by the plaintiffs in their complaint, therefore none is allowed.

The defendants excepted to the judgment and appealed therefrom upon the following grounds:

First. Because of error in construing the will of William Hacket, Sr., as requiring Hugh Hacket, the devisee of the real estate, to become a naturalized citizen of the United States and a resident of York County as a qualification to taking said devise in fee.

Second. Because said decree is contrary to the manifest intention of the testator, as appears from the context of his will.

Third. Because of error in holding that the testator, William Hacket, Sr., died intestate as to the real estate in issue.

Fourth. Because of error in holding that the plaintiffs are such next of kin to William Hacket, Sr., as are qualified to take under our Statutes of Distribution.

Fifth. Because even should it be held that the real estate in issue reverted on the death of Hugh Hacket, said decree is erroneous in holding that it descended to the plaintiffs as heirs-at-law or next of kin; it being in evidence that at the date of the alleged reversion the defendants were heirs of the testator, qualified to take the reversion.

Sixth. Because said decree is otherwise contrary to law and equity, as arising from the facts therein.

*Hart & Hart, Witherspoon,* for appellants, contended that according to the intention of the testator, as expressed in the second clause of the will, construed in connection with the fifth clause, the plaintiffs are entitled to recover, and they cited and commented on the following authorities: *Brailsford* vs. *Heyward,* 2 DeS., 291; *Carr* vs. *Green,* 2 McC., (Law,) 84; *Sealy and Wife* vs. *Lanneau,* 1 DeS., 137; *Carr* vs. *Porter,* 1 McC. Ch., 75; *Bell* vs. *Hughes,* 8 Rich., (Law,) 400; *Shands* vs. *Rogers,* 7 Rich. Eq., 425; Wigram and O'Hara, p. 63; *Fronty* vs. *Fronty,* Bail. Eq., 516; *Keith* vs. *Perry,* 1 DeS., 353; *Edwards* vs. *Barksdale,* 2 Hill Ch., 185; *Smith* vs. *Hilliard,* 3 Strob. Eq., 217; *Hall* vs. *Hall,* 2 McC. Ch., 307; *Ibbeson* vs. *Beckwith,* Tabot, 157; *Wright* vs. *Dew,* 10 Wh., 229; *Brailsford* vs. *Heyward,* 2 DeS., 32; *Earle* vs. *Grim,* 1 Johns. Ch., 499; *Newland* vs. *Sheppard,* 2 P. Wms., 194; *Phillips* vs. *Chamberlain,* 4 Ves., 51; 1 Speer, 365; 3 Brev., 245; 1

McC. Ch., 352; *McDonough* vs. *Murdoch*, 15 How., 404; *Whitney* vs. *Emmot*, 1 Bald., 303; Wigram and O'Hara on Wills, 2d part, 32–59; Wigram on Wills, 58–59, 265; Story Eq. Jur., § 984; 1 Redf. on Wills, 315, 460; *Aulick* vs. *Wallace*, Law and Eq. Rep., March 14, 1877, p. 351; *Mallet* vs. *Smith*, 6 Rich. Eq., 12; *McCaw* vs. *Galbraith*, 7 Rich., 74; *Van Vauckleech* vs. *Reformed Dutch Church*, 6 Paige, 600; *Craig* vs. *Craig*, 3 Barb., 76; *Tucker* vs. *Tucker*, 1 Seld., 408; *Hopewell* vs. *Ackland*, 1 Salk., 239; *Huxtep* vs. *Brooman*, 1 Bro. C. C.; *Wilee* vs. *Wilee*, 2 Bing., 364; 1 S. C., 23; Beav., 25; *Burwell* vs. *Mandevell*, 2 How., 578; 1 Sp., 365; 2 Brev., 298.

*Rion & Wilson*, contra, in addition to the authorities cited in the judgment of the Circuit Court, referred to the following, amongst other cases: *Parris* vs. *Cobb*, 5 Rich. Eq., 451; *Young* vs. *Dinkins*, Rich. Eq., 25; *Dougherty* vs. *Dougherty*, 2 Strob. Eq., 63; *Johnson* vs. *Clarkson*, 3 Rich. Eq., 312.

February 4, 1878. The opinion of the Court was delivered by

McIVER, A. J. This was an action to recover possession of certain real estate in the County of York. Both parties claim under William Hacket, Sr., as a common source of title—the plaintiffs as his next of kin and heirs-at-law, and the defendants as the alienees of his devisee. The plaintiffs contend that though William Hacket, Sr., did leave a will duly executed, yet as to the real estate in controversy he died intestate, and that they, as his only next of kin capable of inheriting, are entitled to the land.

The defendants deny both of these propositions, and contend that the land was well devised by the will, and has come to them from the devisee; but, *failing* in establishing this proposition, they insist that, even if William Hacket, Sr., did die intestate as to this land, the plaintiffs are not entitled to claim it as next of kin and heirs-at-law.

The facts upon which these questions are to be determined are all conceded and are fully stated in the decision of the Circuit Judge. It is contended on the part of the plaintiffs that inasmuch as Hugh Hacket, the devisee named in the second clause of the will, who was an alien, died before he became qualified, "according to Acts of Congress of the United States of America, to take and to hold said real estate," the devise to him failed, because it was only upon his

becoming so qualified "to take and to hold said real estate that the devise could become absolute, and that, therefore, as to such real estate, William Hacket, Sr., died intestate. It becomes necessary, therefore, to determine what is the proper construction of the will. In doing this our first effort should be, if possible, to ascertain what was the real intention of the testator, and this must be done, not by resorting to conjecture as to what was likely to be such intention, but by an attentive and careful consideration of the words of the will in each and every part of it, guided by such rules of law as experience has shown to be useful in seeking such intention. We are to read the will *as a whole*, and *from its terms* ascertain, if practicable, what was in the mind of the testator at the time he executed it.

Looking, then, to the terms of this will in this spirit, we cannot fail to see that the testator had in his mind certain prominent intentions:

1st. An intention to dispose of his *whole* estate; for besides the legal presumption arising from the mere making of the will, we find him saying in the preamble that he is "desirous of disposing of my worldly estate," by which phrase persons are universally understood to express an intention of disposing of all their property or "worldly goods." We next find him, after making various specific dispositions of portions of his property, providing in the fourteenth clause—which must be regarded, as the late Court of Appeals, in *Mallet* vs. *Smith*, (6 Rich. Eq., 12,) did regard it, as the residuary clause of the will—not only for the disposition "of anything not included in the above and not hereinbefore disposed of," but also for the disposition of "any legacies that may fall back." These last quoted words conclusively show that the intention of the testator was to provide in this, the residuary clause of the will, not only for the disposition of such property as he may have overlooked in the previous clauses of his will, but also for the disposition of such as might from *any* cause, whether from lapsed or void legacies or devises or otherwise, fall back into his estate. Nothing can be clearer than that the testator intended that in no contingency should he be regarded as intestate as to any portion of property.

2d. The next prominent intention which appears from the terms of the will is an intention to make his brother Hugh the principal object of his bounty, and after him, in succession, the two sons of Hugh—William and James. This is so manifest that it is alto-

gether unnecessary to consume time or space in pointing out the various provisions of the will indicating such intention. It furthermore appears, from a general review of all the terms of the will, that it was not drawn with technical accuracy. This is manifest from the indiscriminate use of the terms "bequeath" and "devise"— the former being sometimes applied to real estate and the latter to personal estate; from the insertion of the sixteenth clause of the will, which, as said by Dunkin, Ch., in *Mallet* vs. *Smith*, (6 Rich. Eq., 16,) an expert would have known was not necessary; and from the fact that the draughtsman of the will seemed to suppose that an alien could neither *take* nor hold real estate under a will, and that the right so to *take* and hold real estate could be derived solely under an Act of Congress.

Finally, it appears that the testator did, by the second clause of his will, devise the land in question to R. G. McCaw, in trust for the use and benefit of Hugh Hacket, in which clause he uses the following words: "The legal title to remain and be vested in the said Robert G. McCaw until such time as the said Hugh Hacket, now an alien, shall become duly qualified, according to Acts of Congress of the United States of America, to take and to hold said real estate. When the said Hugh Hacket becomes so qualified, the said Robert G. McCaw is hereby directed to execute to the said Hugh Hacket a valid conveyance, in fee, to said tracts of land and house and lots, the rents and profits of said Turkey Creek tract and house and lot in Yorkville to go to the said Hugh Hackett from the time of my decease."

The question then to be considered is, what is the true construction of the words of the will above quoted? Are they to be construed literally, so as to require, as a condition precedent to the vesting of any estate in Hugh, that he should become a naturalized citizen of the United States, or are they to be construed as meaning simply this: that the testator desired to give this property to Hugh, but was only prevented from so doing in absolute terms, vesting a then present estate, by the fact that the alienage of Hugh prevented him from holding real estate, and that so soon as such obstacle was removed he was then to be invested with the full benefit of the bounty clearly intended for him?

Considering this question in the light of the prominent intentions hereinbefore alluded to, which, upon reading the will as a whole, stand out in bold relief, we are irresistibly led to the conclusion

that the testator only postponed the vesting of Hugh's estate because of the disability arising from his alienage, and that when such disability should be removed, *in any way*, the intention of the testator was to vest the absolute estate in his brother Hugh.

We cannot suppose that this proposed bounty was intended as an inducement to his brother to abandon his native land and become a citizen of this country. Such a view is contradicted by the whole tenor of the will. Everything that an alien was capable of taking and holding, even the slaves, for some of whom the testator manifested special care, were given to Hugh without any condition whatever as to naturalization. In addition to this the testator gives to his brother Hugh the rents and profits of the real estate from the time of his decease, showing clearly that his intention was that Hugh should have every benefit from the property possible for an alien to have. This leads to the irresistible inference that but for such disability he would take the absolute estate in the land too. If the property was intended to be offered to him merely as a bribe to become a citizen of this country, it is scarcely probable that he would have been given every benefit to be derived from the property without requiring him to renounce his allegiance to the British Crown and become a citizen of the United States.

The language of the clause under consideration, especially when read in connection with the sixth clause of the will, as it is not only allowable but proper to do, certainly admits of the construction which we have placed upon it. In that (the sixth) clause, the testator, in the event of the death of his brother Hugh and his nephew William before his own death, gives the real estate in question to McCaw in trust to hold the same and convey it to his nephew James, who was an alien, "when the said James becomes *legally qualified* to take and hold said real estate." Now, it cannot be doubted that this language must be construed to mean that James was to have the legal estate whenever he should *in any manner* become qualified to hold it, whether by naturalization or otherwise. Hence, to give the language of the second clause a strictly literal construction, as contended for by the plaintiffs, would involve us in the absurdity of supposing that the testator intended to place more stringent restrictions upon the capacity of his brother to take—manifestly the primary object of his bounty—than he did upon a more distant relation, one who was not only not the primary object of his bounty but two degrees removed beyond it.

The whole force of the argument in favor of the construction contended for by the plaintiffs rests upon the idea that the essential part of the condition upon which Hugh was to be invested with the legal estate consisted in the *manner* in which he was to acquire the capacity "to take and to hold." This, we think, to say the least of it, is an unnatural construction, and that the more reasonable and natural construction is that the testator only intended that the capacity "to take and to hold" should be acquired, and that the *manner* in which it should be acquired was wholly unimportant.

It will be observed that the language of the second clause is, not when Hugh Hacket shall become a *citizen* or become *naturalized*, according to Acts of Congress, which would carry with it something more than the mere right to take and hold real estate, but the language is "shall become duly qualified, according to the Acts of Congress of the United States of America, *to take and to hold said real estate*, not to acquire the right to vote or any other political right, which is the real object of such Acts of Congress. In fact, speaking with strict technical accuracy, it is not correct to say that an alien acquires any more capacity to hold property by virtue of these Acts of Congress, as such rights have their origin solely in the laws of the States. We regard, therefore, the language used in the second clause of the will as a loose and inaccurate form of expressing the same idea which in the sixth clause is embodied in more comprehensive and correct terms, viz.: That as the objects of the testator's bounty were, by reason of their alienage, incapable of holding real estate, provision was made whereby the legal estate should be held by a trustee until such incapacity was removed. And when we find a testator applying the terms "devise" and "bequeath" indiscriminately to real and personal property, we are prepared to expect to find similar inaccuracies of expression in other portions of the will and in relation to other matters.

This being the proper construction of the terms of the second clause of the will, it follows necessarily that there was no intestacy as to the real estate in question, and hence that the plaintiffs failed to establish their right to recover; for even if, as was argued, Hugh Hacket failed to acquire the capacity to hold real estate by the proceedings taken by him for the purpose of becoming a denizen, he certainly became legally qualified to hold such real estate by virtue of the provisions of the Act of 1872, (15 Stat., 73,) placing

aliens upon the same footing as natural-born citizens so far as the capacity to acquire and hold real estate was concerned.

It is not true, as has been supposed, that the decision of the late Court of Appeals in the case of *McCaw* vs. *Galbraith* (7 Rich., 74,) precludes us from taking the view hereinbefore advanced. That case, though not relied upon as having the effect of *res adjudicata*, as it could not be for lack of the necessary identities, it is contended, authoritatively determines certain principles which are inconsistent with the construction which we have placed upon this will. We do not so understand it. In that case not more than two Judges out of the six composing the Court agreed upon any proposition except the point actually decided in the case; and that point was that the inquisition of escheat should be quashed, because the case as made by the proceedings did not show that the escheator was entitled to possession of the real estate of which William Hacket died seized and possessed. Anything else to be found in the case must be regarded as merely an *obiter dictum;* and though entitled to the highest respect on account of the source from which it comes, certainly does not carry with it the weight of authority. And in estimating the weight to be allowed to the *dictum* relied upon by the plaintiffs, we must remember that at the time that case was heard Hugh Hacket had taken no step whatever *towards becoming a denizen,* he not having come to this country until the 6th of November, 1854, while that case was decided at November Term, 1853. Hence the Court did not and could not have had before it the question which we have been considering, *because no event had then occurred* which could give rise to such a question.

From the view which we have taken of this case, it becomes unnecessary to enter upon the inquiry, which would be a purely speculative one, whether the plaintiffs would be the only next of kin of William Hacket, Sr., capable of inheriting his real estate if he had died intestate as to such real estate.

The motion is granted.

*Willard*, C. J., and *Haskell*, A. J., concurred.